Filed 9/26/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>PAUL HERSOM,<br><br>　　　Defendant and Appellant. | A168129<br><br>(San Francisco City and County<br>Super. Ct. Nos.SCN 235199,<br>CT# 22003741) |

A jury convicted defendant Paul Hersom of felony counts of vehicle burglary and being a felon in possession of tear gas and a misdemeanor count of receiving stolen property. On the second day of jury selection, Hersom— who was in jail at the time—did not appear in court. After the bailiff informed the trial court he had received notice that Hersom refused to be transported, the court found that Hersom's absence was voluntary under Penal Code 1043.[1] It then denied the parties' request for a continuance and proceeded with jury selection. Hersom failed to appear the following day as well, and the court continued all further substantive proceedings until he returned. Thus, other than one day of jury selection, Hersom was present for the whole trial.

---

　　\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

　　[1] All further statutory references are to the Penal Code.

On appeal, Hersom claims that his constitutional right to be present at a critical stage of the trial was violated. Specifically, he claims that the trial court lacked sufficient evidence to find that he was voluntarily absent and abused its discretion by not granting the requested continuance. He also claims, and the Attorney General concedes, that he is entitled to four more days of presentence custody credits.

We hold that the record as a whole, including further evidence the trial court heard after proceeding with jury selection in Hersom's absence, contains substantial evidence that Hersom was voluntarily absent on the day in question. We also hold that the court did not abuse its discretion in denying the requested continuance under the factors set forth in *People v. Espinoza* (2016) 1 Cal.5th 61 (*Espinoza*). We therefore affirm, except we accept the Attorney General's concession that Hersom is entitled to four more days of custody credits.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

Shortly before midnight on April 16, 2022, P.S., who lived on Langton Street between Folsom Street and Howard Street, heard "[a] loud bang." He looked out his window and saw a man, whom he later identified as Hersom, "going through the back of an automobile" parked near the Folsom intersection.

P.S. called 911, and a recording of the call was played for the jury. As he was talking to the 911 operator, P.S. saw Hersom remove some items from the car, a Mazda. Hersom then rode away on a bicycle.

A minute or two later, while P.S. was still on the call, Hersom returned and began going through the Mazda again. P.S. told the operator that Hersom was "pulling more stuff out of the back" of the car. The police arrived

2

immediately, while Hersom was still present in possession of "a bunch of stuff." P.S. saw Hersom attempt "to quickly ride away on the bike," but the police surrounded and arrested him.

Meanwhile, I.L., the Mazda's owner, returned to find that the car's "complete back window was shattered in and . . . things had obviously been rummaged around." Several items were missing, including a gym bag, a computer monitor, and some storage baskets containing clothing. I.L. testified that the total worth of these items was between approximately $500 and $750.

When arrested, Hersom had in his possession two backpacks and the bicycle. Inside one backpack were various tools, including a "grinder," a screwdriver, and a bolt cutter, which a police officer testified were all used in automobile burglaries. A container of pepper spray was inside a bag affixed to the bicycle. None of these items were I.L.'s. I.L.'s storage baskets, however, were "nearby [Hersom] in [Hersom's] immediate possession" when he was arrested.

Hersom was charged with felony counts of second degree vehicle burglary and possession of tear gas by a felon and misdemeanor counts of receiving stolen property and possession of burglar tools. It was also alleged that he was ineligible for probation because he was previously convicted of at least two felonies.[2] The jury acquitted Hersom of possessing burglar tools

---

[2] The charges were brought under sections 459 (burglary), 496, subdivision (a) (receiving stolen property), 22810, subdivision (a) (possession of tear gas), and 466 (possession of burglar tools). As to the tear-gas count, it was alleged that Hersom was convicted of nine previous felonies between 2009 and 2020. The probation-ineligibility allegation was made under section 1203, subdivision (e)(4), based on the same nine previous felony convictions.

and convicted him of the remaining three counts.[3]  It then found true the five previous-felony allegations submitted to it.[4]

In June 2023, the trial court sentenced Hersom to a total term of two years and eight months in county jail, composed of the midterm of two years for vehicle burglary and a consecutive term of eight months for possession of tear gas.  The sentence for receiving stolen property was stayed under section 654.  Later that month, the court modified the sentence by suspending the eight-month term for possession of tear gas and ordering it to be served on mandatory supervision.

## II.
### DISCUSSION

*A.    The Trial Court Properly Proceeded with Jury Selection in Hersom's Absence.*

Hersom claims that insufficient evidence supports the trial court's finding that he was voluntarily absent for the second day of jury selection and that the trial court abused its discretion by denying a continuance to attempt to obtain his presence.  We are not persuaded on either count.

### 1.    Additional facts

Hersom attended the first day of jury selection on December 28, 2022.  Before the prospective jurors entered, the trial court asked Hersom how he was feeling.  Hersom stated that although he was "on medication" and felt nauseated, he was well enough to proceed.

---

[3] During trial, the parties stipulated that Hersom was convicted of a felony before April 2022.  In addition, the stolen-property count was reduced to a misdemeanor after the evidence failed to show that the value of the items taken from the Mazda exceeded $950.  (See § 496, subd. (a).)

[4] The jury found true under section 1203, subdivision (e)(4), that Hersom was previously convicted of battery with serious bodily injury under section 243, subdivision (d), in 2020; false imprisonment under section 236 in 2018; and second degree burglary under section 459 in 2017, 2016, and 2015.

4

*December 29*

The following morning, Hersom was not present in court. Christopher Hernandez, the deputy sheriff acting as bailiff, testified that about an hour beforehand, he "received notice from our Transportation Unit that [Hersom] refused to transport to the Hall of Justice." The notice consisted of an emailed list of inmates who were supposed to be in court that day with the word "refused" next to Hersom's name. Deputy Hernandez thought Hersom appeared "[e]xhausted" in court the previous day, but the deputy did not have any information suggesting Hersom was currently "physically ill" or having a "psychiatric or mental health crisis." The deputy himself had not spoken to Hersom, and he did not know about any direct conversation between Hersom and jail personnel leading to the notation that Hersom "refused" to come to court.

The trial court asked the parties whether Hersom was voluntarily absent under section 1043. Hersom's trial counsel argued that Hersom was sick the prior day because he did not get his normal dose of Suboxone, and counsel could "only assume that's how he is today." The prosecutor argued that "in the interest of carefully protecting the record," the court should continue the trial for a day and try to obtain a waiver of appearance from Hersom. Defense counsel joined the request for a continuance.

The trial court concluded that Deputy Hernandez's testimony provided "a sufficient record" for determining that Hersom voluntarily refused to come to court, permitting jury selection to proceed in his absence. The court emphasized that Hersom had said the previous day that he felt well enough to go forward, and he remained in court that whole day. The court also denied the request for a continuance, indicating it did not want to send the prospective jurors home when it was hardly assured that Hersom would

5

agree to waive his right to appear. The court was also "very concerned" about "the possibility that Mr. Hersom is playing a game with the Court and the trial process."

After the prospective jurors entered the courtroom, the trial court stated, "Everybody can see this morning [that] Mr. Hersom is not here. We're going to go forward with jury selection in his absence, nonetheless, and I just want to tell everybody don't speculate why [he] is not here, where he is. Don't speculate, and give it no weight; all right? The law allows going forward with the jury selection and the trial at this point, and so we will."

When questioning a prospective juror who was not seated due to an unrelated challenge for cause, Hersom's trial counsel said, "A bit of an elephant in the room, but Mr. Hersom obviously isn't here today. Are you going to hold that against him at all?" The prospective juror responded, "No. . . . I guess that's his choice. I guess inherently I would have thought he would be required to be here, but I guess if he's not, and everyone seems to be good with that, then yeah." The juror also indicated he would not rely on Hersom's absence in deciding whether to convict. The trial court then reminded all the prospective jurors not to give any weight to Hersom's absence or speculate about why he was not there. Defense counsel subsequently asked another prospective juror, who was seated, if the juror would hold the absence against Hersom. The juror responded, "No. There [are] lots of reasons that he wouldn't be here. I don't want to assume."

By 12:00 p.m., voir dire was completed, and the jury was sworn and released until the following week. Although the trial court considered using the afternoon to start hearing motions in limine, it ultimately decided against it, stating, "I would rather wait until tomorrow morning, with the hope that

6

Mr. Hersom, who voluntarily was absent today, . . . changes his mind and comes to court."

*December 30*

The next day, Hersom was again absent from court. Deputy Hernandez testified that earlier that morning, he got the same emailed notice indicating Hersom had refused transport. Again, the deputy did not have any information that Hersom was physically ill or having a "psychiatric or mental health crisis," and he did not know how it was determined that Hersom refused to come. The deputy did testify, however, that the normal procedure was for a pod deputy to "go around and speak to the individuals who are listed for court . . . that day and ask if they want to go [to] court, and then based on the answers they receive, they will send that down to the . . . deputy . . . who is in charge of creating the list. This deputy will create the list and email it to court, staff, and the court deputy."

Hersom's trial counsel stated he had spoken to Hersom earlier that morning, and Hersom said "that he did want to come to court yesterday, did want to come to court today, and the sheriffs did not allow him to, because . . . he did not have a jail wristband." Counsel reported that according to Hersom, when he was dressed out to attend court on the first day of jury selection, "he took off the wristband, placed it in his pants pocket, because he did not want the jurors to see the wristband, and accidentally left the wristband in the pants pocket at the end of the day." Hersom also told counsel he had "been asking for a new wristband since being placed back in the county jail" but had not received one, and jail staff told him he could not "be transported outside of the jail without [it]." The pants in question were still in the courtroom, and an inmate wristband with Hersom's name on it was in the pocket.

The trial court recessed so that Deputy Hernandez could try to contact the pod deputy who spoke to Hersom and the deputy who created the transport list. When the hearing resumed, Deputy Hernandez reported that he spoke to the pod deputy currently on duty, who had not talked to Hersom that day. In particular, Hersom had not said anything to this deputy about either wanting a wristband or going to court. The current pod deputy stated that another pod deputy, Deputy Khae Saephan, was the one who spoke to Hersom both that morning and the morning of December 29. According to the current pod deputy, Deputy Saephan "documented the refusal for Mr. Hersom [earlier that] morning and stated that he refused but did not state why he was refusing."

Deputy Hernandez also spoke to the deputy who created the transport list, Deputy Fane, who said that "Deputy Saephan had communicated with him that Paul Hersom refused to come to court." Deputy Saephan did not "note anything about whether Mr. Hersom had a jail wristband" on either occasion. Deputy Fane also said that if Hersom "did not have a wristband, they would issue him one, and that should not be a reason why he would not be brought to court."

The trial court observed it had conflicting information, with Hersom saying he wanted to appear but could not because of the wristband issue, and Deputy Hernandez saying that Deputy Saephan "spoke with [Hersom], and [Hersom] refused to come to court but did not state why." Hersom's trial counsel argued that there was insufficient evidence to find that his client was voluntarily absent, indicating it might be necessary "to hear from Deputy Saephan" directly. The prosecutor asked the court to continue further proceedings until the following Tuesday, January 3, 2023, to obtain "more information from the deputies involved and either get a waiver from

8

Mr. Hersom through his attorney or have [him] present." Defense counsel stated that he did not oppose a continuance.

The trial court affirmed its ruling that Hersom was voluntarily absent the previous day, December 29. The court found Deputy Hernandez's information credible and did not accept Hersom's representations to his trial counsel. In particular, the court had "no reason at this point to believe that Deputy Saephan's note [that Hersom] refused but did not state why is either a lie, or confused, or poor choice of words." The court then continued the trial to January 3 as the parties requested.

*January 4*

Ultimately, the trial court did not conduct any "trial-related business" on January 3, because Hersom was again absent that day. Thus, there were no proceedings on the record until January 4, when Hersom was present. At that time, the court allowed the defense to present evidence that Hersom was not voluntarily absent on December 29. The defense provided two pink request forms Hersom claimed to have submitted to the jail in which he asked for a wristband. The first, a "Medical Care Request Form" dated December 29, stated, "Need wrist band[.] Don't have one[.] Need for court[.]" The second, a "Prisoner Action Request" dated January 1, stated, "Need wrist band[.] Please[.] Thank you[.]" The court again declined to change its ruling, although it intended to have Deputy Saephan testify later to "complete this record."

Hersom then moved to dismiss based on his December 29 absence. The trial court denied the motion without prejudice, telling defense counsel, "If you persuade me when all the evidence is in that I was wrong when I found that [Hersom] voluntarily absented himself from the second day of jury selection, then I'll make a ruling consistent with my ultimate findings."

9

*Further proceedings during and after trial*

Toward the end of trial, Deputy Saephan appeared to testify about his interactions with Hersom. The deputy testified that he could not recall his conversations with Hersom on December 29 or 30, including whether Hersom asked for a wristband or said he wanted to go to court. Deputy Saephan testified that it was his practice to take notes of his conversations with inmates and he would "definitely" have made a note if Hersom said he did not have a wristband. The deputy had never personally refused to replace an inmate's wristband.

Deputy Saephan also testified about the jail's general practices around wristbands. Wristbands are used for identification, "medical treatment, [and] to go to court," and are thus important for every inmate to have. Inmates routinely lose or destroy wristbands and ask for new ones, and if an inmate does not have a wristband, staff get one within "[f]ive minutes." Deputy Saephan testified that when inmates go to court, a different deputy checks their wristbands on the bus, so he would not personally check whether an inmate had a wristband in determining whether the inmate wanted to be transported.

Based on Deputy Saephan's testimony, the trial court ordered the sheriff's department to produce any records the jail had pertaining to Hersom's transport on the relevant dates. The next court day, before the jury was instructed, an assistant city attorney produced documents and testified about them in camera.[5] These included a December 29 incident report authored by Deputy Saephan stating that at 5:30 a.m., Hersom "refused court

---

[5] The trial court initially sealed the reporter's transcript of this hearing but later provided it to both parties' counsel for purposes of Hersom's motion for a new trial.

and did not tell me why."[6]  The city attorney also produced the December 29 and 30 transport lists that showed the word "refused" next to Hersom's name.

In addition, the city attorney provided evidence bearing on the forms on which Hersom requested a wristband.  Counsel produced blank examples of the two types of forms Hersom submitted to the court, the "Medical Care Request Form" and the "Prisoner Action Request."  Both forms were "a carbon copy in triplicate, white on top, yellow in the middle[,] and pink on the bottom."  Counsel testified that when an inmate turns in the first type of form, the "inmate gets the pink copy," which is "signed off by medical staff." Similarly, when an inmate turns in the second type of form, "a deputy will initial it and give it back to the inmate so that [the inmate has] the pink copy, and [the deputy has] the original copy to assist in the request."  Neither of the pink forms Hersom produced were signed or dated by jail personnel in the space to do so, and counsel testified that there was no other evidence "that any staff member ever saw them."

The parties returned to the courtroom, and the trial court summarized the in camera hearing.  The court stated it was "satisfied" that the records produced were authentic and that its "finding on December 29th was based on good information."  Thus, it declined to "stop this trial at this point," although it intended to make a fuller record should guilty verdicts be returned.  Over a defense objection, the court then continued with jury instructions and closing arguments.

After the jury returned its verdicts, the trial court set a hearing to allow the parties to respond to the evidence from the in camera hearing and introduce additional evidence.  In the meantime, Hersom filed a motion for a

---

[6] The produced jail records are not part of our record, but the city attorney read the quoted language verbatim from the incident report.

11

new trial on the basis of his absence from jury selection on December 29. The motion also challenged the court's denial of a continuance on that date.

On the scheduled hearing date, Hersom refused to come to court despite having been ordered to do so. Because he intended to testify about his absence on December 29, the trial court continued the hearing to allow his trial counsel to attempt to persuade him to appear.

Hersom appeared at the continued hearing in June 2023. He testified that on December 28, the first day of jury selection, he put his jail wristband in the pocket of his dress pants "because [he] wasn't supposed to be showing that [he] was in custody." At the end of the day, he changed back into his orange jail clothes and forgot to take the wristband with him. He realized he had forgotten it when he was called for dinner that night.

Hersom testified that around 4:00 a.m. on the morning of December 29, Deputy Saephan opened his food port to give him breakfast and asked whether he wanted to attend court. Hersom said, "[Y]es, I want court." Then, around 5:30 a.m., the deputy contacted him over the intercom to "give [him] a reminder" to be ready to go to court. Hersom told Deputy Saephan he did not have his wristband, and Deputy Saephan shook his head and replied, "How the hell are you going to court without a wristband?" According to Hersom, the deputy "did make the . . . call" to get another wristband but "just never followed up." Believing the wristband was coming, Hersom went back to sleep, and "the next thing [he] knew it was 12 o'clock in the afternoon" and he had missed court.

According to Hersom, he submitted both forms requesting a wristband by putting them in some sort of drop box. Though inmates were "technically just supposed to go to a . . . deputy" and the deputy was supposed to sign the form, the deputies did not do that unless the request was "really important or

12

like a grievance." Instead, the "[n]ormal protocol" for a form like those Hersom submitted was to "[j]ust put it in a box." Ultimately, Hersom did not obtain a new wristband until four days later, even though he repeatedly requested one both verbally and in writing.

After hearing arguments from the parties, the trial court denied Hersom's motion for a new trial. It found that Deputy Saephan was a credible witness, although it agreed with Hersom's trial counsel that the deputy testified "he did not specifically remember . . . what was said back on December 29th." Nonetheless, and despite Hersom's contrary testimony, the court found "conclusive" the December 29 "sheriff's log with Mr. Hersom's name with red 'refused.'" The court also reaffirmed its denial of a continuance on December 29, concluding it was "reasonable" to rely on Deputy Hernandez's information about Hersom's refusal and go forward when it "had a lot of citizens in this courtroom waiting."

> 2. The record contains substantial evidence that Hersom was voluntarily absent on December 29.

The federal and state Constitutions protect a criminal defendant's right to be present at trial. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; *People v. Ramirez* (2022) 14 Cal.5th 176, 188 (*Ramirez*).) "Voir dire of prospective jurors is 'a critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present.'" (*People v. Wall* (2017) 3 Cal.5th 1048, 1059.) The right to presence "is not absolute," and it may be explicitly or implicitly waived. (*Ramirez*, at p. 188.) As relevant here, if trial has begun in the presence of a noncapital defendant, and the defendant is later voluntarily absent, "'this does not nullify what has been done or prevent the completion of trial, but . . . operates as a waiver of [the defendant's] right to be present and leaves the court free to proceed with the trial.'" (*Ibid.*)

13

Section 1043, subdivision (b)(2) (section 1043(b)(2)), codifies this principle. (*Ramirez*, *supra*, 14 Cal.5th at p. 188.) The statute provides that a noncapital defendant's "absence . . . after the trial has commenced in their physical presence shall not prevent continuing the trial to, and including, the return of the verdict" if the defendant "is voluntarily absent." (§ 1043(b)(2).) This provision " ' "was designed to prevent [a] defendant from intentionally frustrating the orderly processes of [the] trial" ' " by voluntarily failing to appear. (*People v. Concepcion* (2008) 45 Cal.4th 77, 83.)

There is no dispute that section 1043(b)(2) applies here. The provision includes defendants, like Hersom, who were in custody when they failed to appear, meaning that "a trial court may continue a trial in a custodial defendant's absence after the trial has commenced in the defendant's presence—without first obtaining the defendant's written or oral waiver of the right to presence—if other evidence indicates the defendant has chosen to be absent voluntarily." (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1206 (*Gutierrez*).) The parties also agree that Hersom was physically present when the trial began within the meaning of section 1043(b)(2) because he attended the first day of jury selection. (See *People v. Granderson* (1998) 67 Cal.App.4th 703, 709.)

In assessing whether a defendant is voluntarily absent under section 1043(b)(2), " ' "a court must look at the 'totality of the facts.' " ' " (*Ramirez*, *supra*, 14 Cal.5th at p. 188.) It "may rely on reliable information, such as statements from jail or court personnel, to determine whether a defendant has waived the right to presence." (*Gutierrez*, *supra*, 29 Cal.4th at p. 1205.) California courts apply a "three-part test" established by the United States Supreme Court, asking whether " ' "it is clearly established" ' " that the defendant (1) is " ' "aware of the processes taking place" ' "; (2) is aware

14

" ' "of [the] right and of [the] obligation to be present" ' "; and (3) has " ' "no sound reason for remaining away." ' " (*Ramirez*, at p. 188, quoting *Taylor v. United States* (1973) 414 U.S. 17, 19–20, fn. 3.) Here, only the third element is at issue.

We review a trial court's finding of voluntary absence for substantial evidence. (*Ramirez*, *supra*, 14 Cal.5th at p. 189.) Our review depends on the underlying standard of proof for the challenged factual finding. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) In *Ramirez*, our state Supreme Court addressed whether the " 'clearly established' requirement [for determining voluntary absence] . . . convey[s] a heightened standard of proof designed to protect a defendant's fundamental constitutional right to be present, which might suggest the intermediate clear and convincing standard," as opposed to the lower "preponderance of the evidence" standard. (*Ramirez*, at p. 189.) *Ramirez* did not ultimately decide this issue, because the Court concluded that substantial evidence supported the challenged finding of voluntary absence even under the heightened standard. (*Ibid.*) In assuming the clear and convincing evidence standard applied, the Court framed "the question on review [as] whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that [the] defendant's absence was voluntary." (*Id.* at p. 190.)

Likewise, although the parties here agree the clear and convincing standard of proof applies, we need not definitively resolve the issue. Even applying the less deferential standard of review flowing from that standard of proof, we conclude there is substantial evidence to support a finding that it was highly probable Hersom was voluntarily absent on December 29.

The question why a defendant is absent "can rarely be answered at the time the [trial] court must determine whether the trial should proceed."

15

(*People v. Connelly* (1973) 36 Cal.App.3d 379, 385.) When reviewing a decision to proceed with trial despite the defendant's absence, "it must be recognized that the court's initial determination is not conclusive in that, upon the subsequent appearance of the defendant, additional information may be presented which either affirms the initial decision of the court or demands that [the] defendant be given a new trial." (*Ibid.*) Thus, the "record as a whole" must be assessed for sufficient evidence of voluntary absence. (*Ramirez*, *supra*, 14 Cal.5th at p. 190; *Connelly*, at p. 385; see *People v. Concepcion*, *supra*, 45 Cal.4th at p. 85 [defendant's burden to identify any evidence undermining initial voluntary-absence determination].)

Because we consider the entire record, the relevant question is whether there was substantial evidence that Hersom was voluntarily absent on December 29 by the time the trial court denied his motion for a new trial.[7] Hersom argues that when the court denied that motion, "the only substantial evidence of the voluntariness of [his] so-called 'refusal' on December 29 was a form that showed his name and the word 'refused' on it." He claims this evidence was insufficient to support a finding that it was " 'highly probable' " he was voluntarily absent, given that "[t]he evidence on the other side was overwhelming." (Quoting *Ramirez*, *supra*, 14 Cal.5th at p. 190, italics omitted.)[8]

---

[7] Hersom does not directly contest our ability to rely on evidence developed after December 29. Indeed, he urges that "subsequent evidence . . . clearly undermined" the trial court's initial determination of voluntary absence. But he also claims there was insufficient evidence before the trial court when it made its earlier findings regarding his voluntary absence before it denied the new-trial motion. Given the scope of our review, it is irrelevant whether there was substantial evidence to support each preliminary determination at the time it was made.

[8] Hersom also argues that "a number of elements" *Ramirez* relied on to conclude there was substantial evidence of voluntary absence in that case are

We reject Hersom's assessment, which overlooks the significant other evidence supporting the finding of voluntary absence. Crucially, the sheriff's department produced an incident report in which Deputy Saephan wrote on December 29 that Hersom "refused court and did not tell [the deputy] why." Deputy Saephan and other deputies also provided information about the jail's standard practices tending to prove that an inmate who lost a wristband would immediately receive a new one. Indeed, the trial court could reasonably infer that Hersom did not actually try to obtain a replacement: He testified that he knew the wristband was missing by dinner on December 28, but he did not ask for one then, and jail staff never received the request forms he purportedly submitted later. Even though there was some evidence corroborating Hersom's story, the court was entitled to rely on the significant other evidence he refused to come to court on December 29. Thus, we conclude there was substantial evidence from which the court could find it was highly probable Hersom was voluntarily absent that day.

3.  The trial court did not abuse its discretion by denying a one-day continuance.

Our affirmance of the trial court's voluntary-absence finding "does not end our inquiry regarding the propriety of the . . . court's decision to proceed with the trial in [Hersom's] absence." (*Espinoza*, *supra*, 1 Cal.5th at p. 75.) Under section 1043(b)(2), a trial court may, but is not required to, proceed when a defendant is voluntarily absent. (*Espinoza*, at p. 75.) Thus, "the decision whether to continue with a trial in absentia under the statute or

---

not present here, suggesting the trial court's finding was erroneous. This argument is unpersuasive. (See *City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1502 [looking to specific facts in other decisions finding substantial evidence is "unhelpful" in reviewing such claims].)

declare a mistrial rests within the discretion of the trial court," and we review its ruling for an abuse of discretion. (*Ibid.*)

*Espinoza* contains our state Supreme Court's most recent discussion of a trial court's discretion to continue with trial when a defendant is voluntarily absent. In *Espinoza*, there was a delay of over two years between the filing of the information and the beginning of trial. (*Espinoza*, *supra*, 1 Cal.5th at p. 66.) During this time, the defendant "was represented by seven different appointed counsel . . . , largely due to how difficult a client he was," and sought numerous continuances to the point "that there was concern over the continuing availability of witnesses." (*Id.* at p. 64.) During jury selection, the defendant, who was not in custody, successfully moved to represent himself. (*Ibid.*) Although he "appeared as his own counsel for the completion of voir dire and the examination of the prosecution's first witness," he did not appear on the next day of trial, and "[t]he court recessed for the entire day while efforts were made to locate [him]." (*Ibid.*)

The following day, after the defendant "had still failed to appear and . . . no one had heard from him or located him despite a thorough search," the trial court found he was voluntarily absent and proceeded with trial. (*Espinoza*, *supra*, 1 Cal.5th at p. 70.) "Placed in a dilemma by [the] defendant's disappearance, the court chose not to unilaterally revoke [his] status as his own counsel, and accordingly, did not reappoint counsel to represent [him]." (*Id.* at p. 64.) The defendant did not appear in court again until sentencing, after the jury had returned a "mixed verdict" convicting him of only some charges. (*Id.* at pp. 65, 70–71.) He later told a probation officer "that he 'stopped attending the court proceedings because he was advised by an attorney to stop going so that there would be cause for a mistrial,' " and he

18

unsuccessfully moved for a new trial based on the fact that the trial proceeded in his absence. (*Id.* at p. 71.)

After concluding that substantial evidence supported the finding of voluntary absence, *Espinoza* held that the trial court did not abuse its discretion by proceeding in the defendant's absence.[9] (*Espinoza, supra,* 1 Cal.5th at pp. 75–76.) Our state Supreme Court determined that "the trial court reasonably found that [the] defendant's failure to appear was a continuation of his efforts to manipulate the court and delay his criminal trial," and in turn the court was not required to "reward" his misconduct "by granting a mistrial." (*Id.* at p. 77.)

*Espinoza* also observed that the trial court was "entitled to consider the stage of the trial proceedings." (*Espinoza, supra,* 1 Cal.5th at p. 78.) The jury had been "empaneled with the understanding that trial was anticipated to last at most two weeks," and the presentation of evidence had begun. (*Ibid.*) Yet the court "did not rush to proceed with trial, but recessed for a day while multiple attempts were made to locate [the] defendant. [Citation.] Delaying the trial further would have posed a risk of hardship to the jurors, inconvenience to the witnesses, and disruption to orderly court processes." (*Ibid.*) Indeed, "[t]o declare a mistrial and reconvene a new jury . . . would have been a waste of judicial resources with no certainty of a different result, given [the] defendant's history of delay tactics." (*Ibid.*)

Finally, *Espinoza* found it significant that the trial court took steps to protect the defendant's interests since the trial would proceed with "an empty defense table." (*Espinoza, supra,* 1 Cal.5th at p. 78.) Not only did the court

---

[9] *Espinoza* also held that the trial court did not abuse its discretion by proceeding with trial in the absence of any defense counsel, concluding that the court reasonably declined to revoke the defendant's self-representation rights and appoint counsel. (*Espinoza, supra,* 1 Cal.5th at p. 77.)

19

inform the jury "that the trial would be proceeding without [the] defendant as permitted by law," it later instructed the jury both that it should not consider the defendant's absence for any purpose and that it should not favor either him or the prosecution because of that absence. (*Ibid.*)

From *Espinoza*, we discern several factors bearing on our review of a trial court's decision to proceed with trial in a defendant's absence. First, the nature of the absence is significant, including whether the defendant has failed to appear for purposes of delay or because of other misconduct. (See *Espinoza, supra,* 1 Cal.5th at pp. 77–78.) Second, "the stage of the trial proceedings" is important. (*Id.* at p. 78.) A trial court must weigh the defendant's right to be present against the waste of resources and inconvenience to jurors, witnesses, and other parties that may result from delaying the trial or granting a mistrial. As part of this analysis, the court is entitled to consider the likelihood that the defendant's presence will ultimately be obtained. (See *ibid.*) Finally, efforts by the court to minimize the prejudice to the defense by proceeding with trial may also bear on the analysis. (See *id.* at pp. 78–79.)

Hersom does not cite *Espinoza* in arguing that the trial court erred by denying a continuance on December 29. Instead, he relies on the standard from Justice Liu's dissenting opinion in *Ramirez*.[10] Justice Liu disagreed with the *Ramirez* majority's refusal to consider whether the trial court erred by denying a continuance, stating he would reach the issue and answer in the affirmative. (*Ramirez, supra,* 14 Cal.5th at p. 193, fn. 7 (maj. opn.); *id.* at pp. 199–200 (dis. opn. of Liu, J.).) Citing federal circuit court decisions, he

---

[10] Justice Kruger dissented separately but agreed with the portion of Justice Liu's dissent that we discuss. (See *Ramirez, supra,* 14 Cal.5th at p. 201 (dis. opn. of Kruger, J.).)

framed the rule as follows: "Before deciding to try a defendant in absentia, '[t]he court must consider the likelihood that the trial could take place with the defendant present, the difficulty of rescheduling, the inconvenience to jurors, and the burden on the government and others.' [Citation.] A trial court 'may exercise its discretion to proceed "only when the public interest clearly outweighs that of the voluntarily absent defendant." ' " (*Id.* at p. 198 (dis. opn. of Liu, J.).)

Although *Espinoza* and Justice Liu's *Ramirez* dissent overlap in recognizing the need to weigh a defendant's interests against those of others, the dissent would allow a trial to proceed only if " ' "the public interest *clearly outweighs* that of the voluntarily absent defendant." ' " (*Ramirez, supra,* 14 Cal.5th at p. 198 (dis. opn. of Liu, J.), italics added.) *Espinoza*, however, is the authority by which we are bound. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *National Grange of Order of Patrons of Husbandry v. California Guild* (2017) 17 Cal.App.5th 1130, 1155.) Thus, absent further direction from our state Supreme Court, we decline to evaluate here whether the public interest clearly outweighed Hersom's interest, although the trial court's decision might well have satisfied that standard.

Analyzing the challenged ruling under *Espinoza*, and considering the circumstances of Hersom's absence, we agree with the Attorney General that the trial court "properly considered the possibility of [Hersom's] 'playing a game with the court and the trial process.' " As *Espinoza* makes clear, a court is not required to reward a defendant's attempts at delay by halting a trial. Although there was no evidence of previous misconduct here approaching that in *Espinoza*, the court was reasonably concerned about the possibility that Hersom was attempting to manipulate the court and delay

the proceedings. Because Hersom was in custody, the court had information that he had "refused," not just failed, to come to court. He also had not communicated with his trial counsel. Absent any solid indication of a valid excuse for the absence, the court could consider the possibility that Hersom had an improper motive for not appearing.

We also discern no abuse of discretion in the trial court's balancing of interests. The trial court was clearly hesitant to send home the prospective jurors, who are often summoned "at great cost and inconvenience" for them. (*People v. Granderson*, *supra*, 67 Cal.App.4th at p. 708.) Indeed, by the time jury selection begins, "significant resources (both fiscal and human) have been tapped," including by assigning a courtroom and personnel to the trial and arranging the schedules of the attorneys, the trial court, and the witnesses. (*Ibid.*)

Moreover, Hersom had already attended one day of jury selection, and once that process was concluded the trial court continued all further substantive proceedings until his presence was secured. Thus, unlike in *Espinoza*, where the bulk of the trial was conducted outside the presence of the self-represented defendant, only one day of jury selection was conducted outside the presence of Hersom, who was represented by counsel. The court hardly " 'summarily plung[ed] ahead' with trial in [his] absence," as Hersom claims. (Quoting *Gutierrez*, *supra*, 29 Cal.4th at p. 1209.) To the contrary, the court tried to minimize the impact on his right to be present while respecting significant countervailing interests.

In arguing otherwise, Hersom claims "[t]here was no indication that the trial could not soon continue with [him] present, nor that there was any difficulty in re-scheduling the remainder of the trial, nor that there was any burden on the government due to a short continuance." But he ignores the

22

potential burden to parties other than the government, including the jurors and the trial court.  Though we agree with Hersom that it is relevant that the prosecutor did not oppose a continuance of the trial, the People's agreement to a continuance is not determinative.

Finally, the trial court attempted to minimize any prejudice to Hersom by instructing the prospective jurors not to consider his absence.  And Hersom's trial counsel had the opportunity to question jurors about the issue and could have challenged any juror who reacted negatively to Hersom's absence.

In holding that no error occurred, we do not minimize the importance of jury selection as a critical stage in a criminal trial.  Although the violation of the right to be present is not structural error, in many cases it will be difficult to conclude that a defendant's absence during jury selection was harmless beyond a reasonable doubt.  (See *People v. Davis* (2005) 36 Cal.4th 510, 532.)  Indeed, Hersom identifies several reasons that his absence on December 29 might have been prejudicial, including by depriving him of the ability to see how prospective jurors reacted to him and to consult with his trial counsel about the selection process.  But ultimately, we need not evaluate any potential prejudice stemming from Hersom's absence because we conclude the trial court properly proceeded despite it.

B.      *Hersom Is Entitled to Four Additional Days of Custody Credits.*

Hersom claims that his presentence custody credits were improperly calculated by four days.  We accept the Attorney General's concession that Hersom is entitled to four more days of credits.

The trial court determined that Hersom spent 248 days in actual presentence custody, entitling him to 248 days of actual credits.  (See § 2900.5, subd. (a).)  He was also entitled to two days of conduct credits for

every two days in actual custody. (§ 4019, subd. (f); *People v. Whitaker* (2015) 238 Cal.App.4th 1354, 1358.) Thus, the court awarded him 248 days of conduct credits, for a total of 496 days of custody credits.

But the probation report on which the trial court relied to calculate actual credits contained an error. The report stated that Hersom served 52 days in custody between July 21, 2022, and September 12, 2022, when he was released on GPS monitoring. But any partial day in custody counts as a full day. (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 84, fn. 4.) Thus, Hersom spent 54 days in custody during this period, not 52. As a result, he is entitled to two additional days of actual credits and two additional days of conduct credits, for a total of 500 days of custody credits.

### III.
#### DISPOSITION

The trial court is directed to amend the June 28, 2023 minute order to reflect that Hersom has 250 days of actual credits and 250 days of conduct credits, for a total of 500 days of presentence custody credits. The judgment is otherwise affirmed.

_____

Humes, P. J.

WE CONCUR:


_____

Langhorne Wilson, J.



_____

Siggins, J.*




*Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Hersom*  A168129

25

Trial Court:

Superior Court of the City and County of San Francisco


Trial Judge:

Hon. Harry M. Dorfman


Counsel:

Joy A. Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant.


Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Bridget Billeter, Supervising Deputy Attorney General, Maya Bourgeois, Deputy Attorney General, for Plaintiff and Respondent.

*People v. Hersom*  A168129